# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MAURICE A. JACKSON, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No.: **3:10-cv-00221-JPG-PMF** |
| DONALD GAETZ, *et al.*, | ) ) ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

**FRAZIER, Magistrate Judge:**

This matter has been referred to United States Magistrate Judge Philip M. Frazier from United States District Judge J. Phil Gilbert pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and SDIL-LR 72.1(a) for a Report and Recommendation.

Before the Court is defendant Drain, Foster, Lockhead, and Phillips' motion for summary judgment (Doc. 41) and memorandum in support (Doc. 42). The plaintiff has filed a response (Doc. 43) in opposition to the motion. For the following reasons, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment (Doc. 41) be **GRANTED**.

## FACTS

Interpreting the record most favorable to the nonmoving party, the Court will now summarize the relevant facts of this case. In June of 2009, the plaintiff, Maurice A. Jackson, an inmate at Menard Correctional Center ("Menard"), was preparing a lawsuit against Rashonda Pollion, a nurse that worked at Menard. On June 17, 2009, Jackson received a disciplinary ticket for intimidation or threats, resulting in six months in segregation. On the next day, Jackson began filing a series of grievances relating to the disciplinary ticket and inmate mail issues. As a result, Jackson believes that word began to circulate around Menard that he was filing grievances

1

and a lawsuit against Ms. Pollion. Subsequently, Jackson also claims he began to experience retaliation from Menard prison employees.

In august of 2009, Jackson believes that the correctional officer defendants (Phillips, Foster, Lockhead and Drain) began retaliating against him by contaminating his food with human waste (urine), saliva, bugs, sticks, bristles from sweeping brooms, dirt, hair, and sleeping pills (among other substances) while Jackson was taking various medications for food poisoning and stomach pains. Jackson states that the food contamination ceased for a brief time period in mid-August through September 3, 2009. After he filed his lawsuit against Ms. Pollion on September 3, 2009, Jackson claims the food contamination began to reoccur with increased frequency.

## PROCEDURAL HISTORY

On March 23, 2010, Jackson filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging that several defendants violated his constitutional rights by retaliating against him for engaging in speech protected by the First Amendment of the United States Constitution. In its initial screening order dated January 25, 2010, the Court exercised its screening authority, pursuant to 28 U.S.C. § 1915A, to dismiss several claims and defendants from this case. *See* Doc. 8. The remaining defendants (Phillips, Foster, Lockhead, and Drain) are all correctional officers that were employed by the Illinois Department of Corrections at the time of the alleged illegal conduct. With respect to these defendants, Jackson alleges that the defendants retaliated against him for filing grievances and lawsuits by contaminating his food. *See* Doc. 1 at 6 ¶ 19. Specifically, Jackson further alleges that the defendants contaminated his food with hormone medication and various foreign substances. *See id.* at 6 ¶ 19-20. Finally, Jackson claims that defendant Lockhead retaliated against him by denying him access to the health care unit. *See id.*

at 9 ¶ 34. In the initial screening order, the Court found that these allegations were sufficient to state a First Amendment retaliation claim against defendants Phillips, Foster, Lockhead, and Drain. *See* Doc. 8 at 2-3. On June 21, 2011, the remaining defendants filed the instant motion for summary judgment (Doc. 41) seeking judgment as a matter of law as to Jackson's retaliation claims.

## DISCUSSION

The Court will first summarize the applicable law relevant to this case and will then provide its analysis and recommendation regarding the instant motion.

### I. Motion for Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396. In order to defeat summary judgment, the nonmoving party must do more than raise a metaphysical doubt as to the material facts. *Keri v. Board of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006), *cert. denied*, 549 U.S. 1210, 127 (2007), citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, he "must come forward with specific facts showing that there is a genuine issue for trial." *Id.* Lastly, a non-moving party's complete failure of proof concerning an essential element of his claim in which he holds the burden of proof necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 323.

## II. First Amendment Retaliation Standard

In order to prevail on a First Amendment retaliation claim, a plaintiff must prove that (1) he or she engaged in activity protected by the First Amendment; (2) the protected activity was a but-for cause of the defendant's action; and (3) he or she suffered a deprivation because of the defendant's action. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) (citing *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 501 (7th Cir. 2010)). Under the first element, an act by a prison official that impinges on prisoners' constitutional rights is valid if "reasonably related to legitimate penological interests." *Watkins v. Kasper*, 599 F.3d 791, 794–795 (7th Cir. 2010) (citing *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (holding that prison officials have broad discretion to regulate prisoners' speech when consistent with legitimate penological interests); *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009)).

Recent U.S. Supreme Court and Seventh Circuit case law has changed the causation element of a First Amendment retaliation claim formerly utilized in this Circuit. Formerly, courts in this Circuit followed the "motivating factor" test for causation where a plaintiff needed to show that the protected activity was a motivating factor in a defendants decision. *See Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008) (citing *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004) (rejecting the "but-for" causation test)). Under the "but-for" causation test, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that [an illegal purpose] was the "but-for" cause of the [defendant's adverse action]." *Gross v. FBL Financial Services, Inc.*, —— U.S. ——, ——, 129 S.Ct. 2343, 2351 (2009); *see also Kodish*, 604 F.3d at 501 (following the *Gross v. FBL Fin. Serv., Inc.* case); *Fairley v. Andrews*,

4

578 F.3d 518, 525–26 (7th Cir. 2009) (finding that the "motivating factor" test does not survive after the *Gross v. FBL Fin. Serv., Inc.* case).

Lastly, the Plaintiff must prove that he or she suffered a deprivation because of the defendant's actions. *Kodish*, 604 F.3d at 501 (citations omitted). "[B]oth threats designed to deter future speech and penalties for past speech are forbidden." *Fairley*, 578 F.3d at 525. This element is satisfied when the "retaliatory activities would "deter a person of ordinary firmness" from exercising First Amendment activity in the future." *Bridges*, 557 F.3d at 552 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).

### III. **Defendants' Motion for Summary Judgment**

The defendants' (Doc. 41) motion for summary judgment essentially turns on one element of the First Amendment retaliation claims. The parties do not disagree that the plaintiff engaged in protected First Amendment activity, as required by the first element of Jackson's retaliation claims. With respect to the third element, it necessarily goes without saying that a person of ordinary firmness would be deterred from exercising protected First Amendment activity if exercising that right would result in deliberate contamination of the person's food. That leaves the second element of Jackson's retaliation claim; causation. The defendants argue in their (Doc. 41) motion for summary judgment that Jackson cannot establish a claim for retaliation because the plaintiff cannot prove that his First Amendment activity was the reason any alleged retaliation occurred. *See* Doc. 42 at 4. In response, Jackson argues that he has enough evidence to demonstrate that a genuine issue of material fact exists for trial on the causation element. *See* Doc. 43 at 6-9.

In the Seventh Circuit, "the causation analysis for a § 1983 retaliation claim tracks the causation analysis for a Title VII retaliation claim." *Spiegla*, 371 F.3d at 943 (quoting *Johnson v.*

*Univ. of Wis.-Eau Claire*, 70 F.3d 469, 482 (7th Cir. 1995). "A plaintiff in a Title VII case may offer either direct proof of sex-based discrimination or retaliation, or may use the burden-shifting approach established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Johnson*, 70 F.3d 469, 477 (7th Cir. 1995) (citing *King v. Board of Regents*, 898 F.2d 533, 537 (7th Cir. 1990). However, the Seventh Circuit, in *Kodish*, recently questioned whether the burden-shifting analysis survived the U.S. Supreme Court's decision in *Gross v. FBL Fin. Serv., Inc.. See Kodish*, 604 F.3d at 501 ("Whether such a burden shifting analysis survives the Supreme Court's declaration in Gross in non-Title VII cases, remains to be seen."). The Court need not address this issue here because the *Kodish* court also clarified what is meant by direct evidence of retaliation:

> Under the direct method, the plaintiff survives summary judgment if he can demonstrate "triable issues as to whether discrimination motivated the adverse employment action." *See Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009). The focus of the direct method of proof thus is not whether the evidence offered is itself "direct" or "circumstantial" but rather whether the evidence "points directly" to a discriminatory reason for the employer's action. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). "Direct" proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion (e.g., "You're too old to work here."), but also includes circumstantial evidence which suggests discrimination through a longer chain of inferences." *Id*. at 671.

*Kodish*, 604 F.3d at 501.

### A. Evidence of Retaliation

As a preliminary matter, Jackson will need to be able to demonstrate that his food was actually contaminated in order to begin to prove retaliation in this case. While there may be some indication that Jackson may be able to prove that he got sick from the food served by

6

prison officials,[1] Jackson will be unable to more specifically prove that his sickness was a result of deliberate food contamination. Jackson's cellmate, Eden Maya-Vergara, stated in his deposition that Jackson would occasionally show him what Jackson purported to be foreign substances in Jackson's food. *See* Doc. 42-1 at 14-17. However, Maya-Vergara would not go as far as to speculate as to whether the food was contaminated or whether it was just poor quality food. *See id*. at 14, 16, 20-21. Similarly, the Court cannot speculate as to how the alleged foreign substances made it into Jackson's food.

Much of Jackson's evidence falls short because too much of his case is based on speculation and merely restating the allegations of the complaint without any additional evidence to verify his claims. For example, in his deposition, Jackson attempts to explain his allegation that the defendants contaminated his food with hormone medication as follows:

> Q: Okay. And you have never taken hormone therapy before?
> A: Never.
> Q: No? So would you know what it looks like?
> A: Well, they have magazines that has little magazines that show them in the back of the magazines.
> Q: Oh, are they pills?
> A: No, just liquids. They have pills, too, but it's liquid.
> Q: So is it a clear liquid, or is it just a bottle that the magazine shows?
> A: It's a clear liquid.
> Q: So it's something you would be able to see?
> A: Right.
> Q: Got you. So is it something that you've never – is it something that you'd be able to smell, but you've never –
> A: You can't smell it.
> Q: But you have [n]ever had hormone therapy?
> A: I've never had hormone therapy.
> Q: How do you know that there's no smell?
> A: I can't really say that.

---

[1] In his deposition, Jackson indicated that the only time he ever got extremely sick from the prison food while he was segregation was when he ate both his and his cellmate's tray of Sunday gravy. *See* Doc. 42-1 at 10. This bout of Sunday gravy sickness was corroborated by Jackson's cellmate, Eden Maya-Vergara, in his deposition as the only major sickness that occurred while the two men were cellmates. *See* Doc. 42-1 at 14, 17-18, 20, 22.

> Q: It's just something you believe?
> A: Right.
> Q: Okay. Do you think there's a taste to it?
> A: I don't think there's a taste to it.
> Q: But again, you've never had it?
> A: Right. I've never had therapy.

Doc. 42-1 at 6.

At this stage in the litigation, beliefs and conclusory assertions, without further supporting evidence, do not amount to evidence that may be considered by the Court in support of a motion for summary judgment. *See, e.g., Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). Considering the evidence most favorably for Jackson, it appears that he will be unable to establish that his alleged sickness was caused by purposeful food contamination.[2]

Furthermore, Jackson has no evidence, circumstantial or otherwise, to suggest that the named defendants in this case retaliated against him in any fashion. Jackson argues that the evidence demonstrates that the defendants had access to his food and, therefore, had an opportunity to contaminate his food. Jackson further argues that the defendants learned that he typically took the second tray of food when it was delivered to his cell, and the defendants began to contaminate the second tray of food. It is true that part of the job responsibilities for the defendants was to assist in the delivery and distribution of food trays to the inmates at Menard. Except when the prison is in lockdown, two correctional officials and one prisoner-worker are

---

[2] There is some indication that the ailments that Jackson purportedly suffered from as a result of food contamination may actually be due to the side effects of certain prescribed medications. *See* Doc. 42-1 at 6. It should also be noted that Jackson believes his ailments could also be attributed to the use of soy in his prison diet. *See* Doc. 1 at 9-13. Jackson's cellmate indicated that he thought Jackson may have gotten sick from overeating the Sunday gravy. *See* Doc. 42-1 at 18.

responsible for delivering the food to the inmates.[3] The food served to prisoners originates from the kitchen and is loaded onto a cart. The cart contains about ten to fifteen racks, and there are about fifteen foam trays loaded onto each rack. The first correctional officer unlocks the chuckhole on the front of the cell. The prisoner-worker then typically slides two trays into the chuckhole. The second correctional officer closes and locks the chuckhole, and the trio repeats the process for the next cell. The trio are typically responsible for serving 300-400 prisoners in a manner of roughly two hours. Therefore, from a sheer logistics standpoint, any purposeful food contamination would likely have to occur moments before the food was delivered through the chuckhole. This is due to the fact that the defendants are responsible for delivering many trays of food to many inmates in a very short period of time. This point is particularly important because Jackson admitted several times during his deposition that he never witnessed any purposeful food contamination by the correctional officer defendants in this case:

> Q: Okay. Did you ever see anyone put anything on your tray?
> A: Not specifically.
> Q: Not specifically. Did you ever see any of the defendants put anything on your tray?
> A: No, no.
> Q: And did you ever see them put anything in your food, or did they ever tell you, like, I put a bug in your food?
> A: Uh-uh.

> Doc. 42-1 at 5.

> Q: Okay. So just to clarify, you never saw any of the defendants contaminate your food?
> A: Right.
> Q: You have no evidence that the defendants know of or are upset about grievances or lawsuits you've filed?
> A: Yeah. I'd say that, correct.

---

[3] According to the depositions, when the prison is in lockdown status, only correctional officers are involved in distributing the food. However, the prison is not in lockdown status the vast majority of the time.

Doc. 42-1 at 7.

> Q: Even though you might have been worried that they would retaliate more or that it would stop by filing greivances, you still never saw any of the defendants contaminate your food, correct?
> A: Right.
> Q: You have no evidence that they did this at all, correct?
> A: Correct.
> Q: Except for your belief?
> A: Right.

Doc. 42-1 at 10.

Similarly, Maya-Vergara did not witness any correctional officer ever put anything in the food delivered to their cell. *See* Doc. 42-1 at 22.

Because there is no evidence to suggest that the defendants contaminated the food shoirtly before inserting the trays into the chuckhole at Jackson and Maya-Vergara's cell-front, Jackson would need likely to have some sort of other proof that the contamination occurred at some earlier time on in the food distribution process. Like so much of the rest of his case, Jackson expects the Court to rely on his beliefs and conclusory assertions that these events occurred. However, there is simply no corroborating evidence to suggest anything remotely close to deliberate food contamination by the defendants ever happened here. In addition, Jackson has no evidence, other than his own bare allegations, that defendant Lockhead ever retaliated against him by denying him access to the health care unit, and defendant Lockhead specifically denied this allegation in his deposition. *See* Doc. 43-5 at 5. Based on all the evidence, it appears Jackson is unable to demonstrate a genuine issue of material fact for trial on whether the defendants retaliated against Jackson in any manner.

### B. But-For Causation

Even if Jackson had any evidence that the defendants retaliated against him in some way, Jackson ultimately lacks proof that his protected First Amendment activities were the but-for cause of the alleged illegal conduct. "In order to establish that a defendant retaliated against a plaintiff because of a protected constitutional right, a plaintiff must demonstrate that the defendant knew of the retaliation and knew of the plaintiff's constitutional activities." *Stagman v. Ryan*, 176 F.3d 986, 999 (7th Cir. 1999) (citations omitted). Jackson argues that the alleged "verbal assaults" that he alluded to in his deposition (*see* Doc. 42-1 at 10) are proof that the defendants were aware of Jackson's protected activity. Maya-Vergara did recall an incident where Jackson argued with correctional officers at the cell door. *See* Doc. 42-1 at 18. Maya-Vergara also recalled a time when an unknown correctional officer said "enjoy" in sarcastic way while delivering food to the cell. *See* Doc. 42-1 at 16. However, Maya-Vergara did not reach the same conclusion as Jackson, who believed that the correctional officer was telling him that his food was contaminated. *See id.* Furthermore, there is no evidence to suggest that any correctional officer that Maya-Vergara recalled in his deposition is a defendant in this case. *See* Doc. 42-1 at 18.

Jackson further argues that the timing of alleged food contamination demonstrates that the defendants were aware of Jackson's protected First Amendment activity. Jackson submits that the alleged retaliation began almost immediately after Jackson believes the defendants learned of his potential lawsuit against a fellow prison employee, Ms. Pollion. The alleged contamination started again when Jackson began filing grievances regarding his prison mail, and then after a brief cessation, the contamination started again when Jackson filed his lawsuit against Ms. Pollion. According to Jackson, all of these weak proofs form a chain of inferences

that add up to strong proof of causation. However, the Court finds that there are just too many missing links in that chain to conclude that there is an issue here for trial on the causation element of Jackson's claim.

Jackson's arguments are particularly tenuous in light of the fact that he has no evidence to suggest that the named defendants actually possessed knowledge of any of his protected First Amendment activity. Even if the Court were to accept Jackson's timing argument as evidence of knowledge by Menard prison officials of Jackson's protected activities, there is no evidence that suggests that the specific defendants Jackson named in this lawsuit had any such knowledge. All four correctional officers stated in their depositions that they did not even know Ms. Pollion (personally or professionally) and had no prior knowledge of Jackson's lawsuit regarding Ms. Pollion or any of Jackson's grievances. *See* Doc. 43-3 at 2, 6; 43-4 at 5, 7; 43-5 at 3, 6; 43-6 at 3, 6. In sum, Jackson's beliefs and assertions (without further supporting evidence) that his participation in protected activities was known by the defendants in this case are insufficient at this stage in the game. *See, e.g., Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992) (affirming the District Court's grant of summary judgment for the defendant and finding that a conclusory assertion by the plaintiff, a former employee, that her political affiliation was "well known" did not support her claim that political affiliation was motivating factor in her discharge by the defendant, who was member of opposing party; by way of affidavit, defendant unequivocally denied any knowledge of plaintiff's political affiliation before discharging her, and plaintiff offered no evidence to rebut that denial).

Considering all of the evidence most favorably for the non-moving party, Jackson has failed to demonstrate that there is a genuine issue of material fact for trial on the causation element of his First Amendment retaliation claim. Because this is an essential element of the

plaintiff's claim, the defendants are entitled to judgment as a matter of law in this case. *See Celotex Corp.*, 477 U.S. at 323.

## **RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that the Defendants' Motion for Summary Judgment (Doc. 41) be **GRANTED**.

If this Report and Recommendation is adopted in its entirety, there will be no further issues requiring the Court's attention in this case.

**SO RECOMMENDED.**

**DATED: August 22, 2011.**

*/s/ Philip M. Frazier*
**PHILIP M. FRAZIER**
**UNITED STATES MAGISTRATE JUDGE**